My name is David Bookbinder and I represent Petitioner South Texas Environmental Justice Network. I'd like to start the discussion with standing and then from there move on to the question of what criteria Texas LNG needed to show in order for Texas Commission on Environmental Quality to grant the third extension of the deadline to commence construction. There's no dispute about injury that Petitioners has members who recreate frequently and will continue to recreate frequently at a unit of a National Wildlife Refuge which directly abuts the Texas LNG facility. The question has been raised as to whether or not these injuries are traceable to the third extension. I can't imagine a cleaner set of circumstances involving traceability. If there is a third extension, Petitioner is injured. If there is no third extension, Petitioner is not injured. Respondent's theory is all of Petitioner's injuries trace back to the original permit. The problem with that is as a policy matter, that means no one would ever be able to challenge any agency extension of any permit for any length of time for any reason. Because the agency can always simply say, oh sorry, you're not injured by the extension, you're simply injured by the original permit. Thereby insulating all subsequent decisions about extensions from any review. That said, I'd like to turn to the critical issue, which is what is required for TCEQ to find that Texas LNG satisfied the criteria in 30 Texas Administrative Code 116.120, which I will simply refer to as 120 so we don't have too many numbers flying around here. Now, during the administrative process, the TCEQ application form told Texas LNG attach the federal applicability description, which is shorthand for the analysis as to the National Ambient Air Quality Standards, which is a health-based standards. Page 22 of the record on appeal explains why the language federal applicability description is shorthand for the NAAQS. So page 43 of the records, TCEQ's application form says attach the federal applicability description and attach the best available control technology backed demonstration. Then in TCEQ, when Texas LNG submitted its application, its cover letter said as specified in 120B, second and third extensions. They said, Texas LNG said second and third extensions may be subject to revision for consistency with backed and that the federal permitting applicability NAAQS issue was also reevaluated. In the third in the decision, TCEQ's decision on the third extension, they say the third extension is allowed, this is on page 46 of the record, because LNG, quote, per 120B, the applicant has demonstrated compliance with current backed and has not made changes to the previously authorized project, which was demonstrated to be protective of human health. So our position is for a third extension that the applicant has to show both that the emissions will remain protective of public health and that the emissions are still being controlled by the best available control technology. But what about the fact that subsection C, referring to the third extension, only requires compliance with B-2? It doesn't mention B writ large. It just talks about B-2. Correct. The question is, does, can you take the B out of B-2? You can have, there are two ways to get a second extension under B. You can get a second extension because of litigation or you can get a second extension because of expenditure. And if you've gotten a second extension based on the litigation exception, as Texas LNG did, you can, you can get a third extension based on expenditure. So what TCEQ is saying here, well, the expenditure criteria for a second extension includes all of the preamble in B, if you're doing it for a second extension. But if you're doing it for a third extension, it doesn't include the preamble for B. And there's no way, really, to read B-2 without the B. So, yeah. What if the drafter had intended to refer only to B-2? What would you have them do other than say B-2? I would say, I would simply say that the, I would repeat the language. The permit holders spent or committed to spend 10 percent of the estimated cost. Surely you'll give drafters the convenience of referring to language by section reference rather than repeat the entire section language. Yes. But as we Why is B-2 not enough? Because in rules of textual It seems to me, I'm sorry to interrupt, but it seems to me that under your theory that would have been accomplished had they simply referred to B. No, because they've already gotten, well, actually, they could have said that They could have said at the bottom of C if the permit holder meets the conditions of subsection B of this section. If they had said that, that would have accomplished what you're saying they accomplished. So why, why ignore the fact that they didn't do that? They said B-2 rather than B. For two reasons. One, textual reading, including the cases that we cite and the Justice Scalia's treatise says when you have this sort of statutory or regulatory language that the one and the two incorporate B. You can't read them separately that the B applies to both one and two. More importantly, that is what in the application process, in the decision, and then most importantly, TCEQ's brief below during the motion to overturn, and I quote, for the third and final extension, Texas LNG must demonstrate that the permitted emissions comply with all rules and regulations of the commission and intent of the Texas Clean Air Act, including protection of the public's health and physical property. That's a verbatim quote from B. And that's TCEQ saying for the third and final extension, Texas LNG must demonstrate compliance with that. And that's on page 73 of the Record on Appeal. So the question then becomes, assuming that both the BACT requirement and the NAAQS demonstration apply to third extensions, how do they do on those? Well, let's start with the NAAQS. This is the most serious question because the NAAQS is a standard set to protect public health. And when this permit was granted in 2020, the NAAQS for particulate matter 2.5, meaning particles of 2.5 microns or less in diameter, the standard was 12 micrograms per cubic meter. That was the standard in 1990. But that standard was lowered to 9.0 micrograms per cubic meter months before Texas LNG even applied for the third extension. And there's no doubt it is undisputed that at that point, the background concentration at that point was above 9.0. It was 10.9 at that point. And the easiest reference for that is Texas LNG's brief on page 14 refers to a they made to the Federal Energy Regulatory Commission on December 20th, 2024. And they have a footnote to it, and they link to it. I believe that I discovered that the link itself, I believe, is to the wrong document. The correct document is cited, but I believe the link is to the wrong document. In the correct document, which the one they cite, tables 13.7, 13.9, C4, C5, and C6 all state that the background concentration at that point was 10.9. In other words, the air already exceeded the health-based standard. And the importance of this was emphasized below by the Office of Public Interest Counsel on the briefing to motion overturn. And I will actually read this passage. This updated standard must be considered to protect public health and ensure that the facility's emissions will not cause or contribute to a violation of the NAAQS. It is essential to evaluate whether Texas LNG's emissions might cause or contribute to an exceedance of the newly established PM2.5 limit, as this would significantly impact the decision to grant an extension. That is why it is so important that they take account of the fact that the standard had changed between the time the permit was issued and now with the third extension. Now, TCEQ's third extension decision simply said the applicant has not made changes to the previously authorized project which was demonstrated to be protective of human health. That's correct. In 2020, it was. But it doesn't mention the fact that the standard changed. The standard was A, dramatically reduced, and B, the background concentration of PM2.5 already exceeded that standard. And in its briefing, TCEQ simply says, well, this is not applicable. We don't have to look at NAAQS for a third extension. And Texas LNG talks extensively about modeling that it has done that shows it's okay that its emissions aren't going to cause a problem. And that is, we question that, but the issue is that's something that TCEQ should have decided. And in a recent 28-J from Texas LNG, they point to a decision by FERC saying it looks like everything is okay. That relied on a NEPA document. And the NEPA document, as we say in our response to the 28-J, that NEPA document says this is NEPA. This is National Environmental Policy Act. This is NEPA. This is not an air permitting review. That is up to the Texas Commission on Environmental Quality. So then we have the issue of best available control technology, BACT. And the application has a very simple set of pages about BACT. It lists the emission sources at the facility in one column. In the next column, it says here are our permit limits. And in the third column, it says here is what the best available control technology is. All we did was take their information and say your permit limit is X, but you say BACT is more stringent than X. And you say your permit limit is Y, but you're also saying BACT is more stringent than Y. We just took the information from their submission. This is not our opinion about this. There's a very useful example of that concerning, God help us, HTF heaters with ultra-low NOx burners. The BACT standard is 0.01 pounds per million BTU. BACT, the limit that TCEQ gave them was 50 percent higher than that, 0.015. In 2020, they gave them a limit 50 percent higher than that based on considerations of technical practicability and economic reasonableness. That certainly has to be something that TCEQ goes back and looks at five years later has the technical practicability or certainly the economic reasonableness of applying the actual standard changed in five years. And that's precisely what TCEQ did not do. With my brief remaining time, I'm going to talk about the second extension and whether or not that was valid. Is that beyond our purview? Is the second extension beyond our purview? The second extension, the issue is did the Petitioner waive any objection to the second extension by not challenging it at that time? The problem with that is there is no public notice and comment. And as a matter of fact, there's an entire section, I believe it's section 4B in TCEQ's brief saying public notice and comment procedures do not apply to construction deadline extensions. So what we're being told by respondents is you're too late, you've waived the opportunity to challenge something that we never told you about. I see my time is up. Thank you very much. You have reserved time for rebuttal. Yes, I did, sir. Five minutes. Thank you. Ms. Cagle. Good morning. May it please the Court, my name is Amanda Cagle and I represent the Texas Commission on Environmental Quality, its chairwoman and its executive director. My argument is going to focus on two points mainly. The permit is not void and that the substantial evidence supports the Commission's decision. But before I get there, I'd like to take just a moment to clarify what the actual decision on appeal is here. It's an extension of time to begin construction. It is not an appeal of the permit on the merits. And the question in an extension of time isn't whether the facility can be built, it's when it can be built. Whether it can be built has already been determined in the permitting proceeding and in the direct appeal of that permitting proceeding, which ended in 2023. Here, an appellant who didn't even participate in the direct appeal is trying to use the extension of time to begin construction to collaterally attack the permit itself. But under Texas law, the merits of a permit can only be attacked in a direct appeal, which this case is not. But if the extension is denied, then what do you have left? If the extension is denied, well, and to be clear, it's a motion to overturn the grantee and the extension. Then it would go back to the Commission, who could either reevaluate it or send it back to the ED if this Court believes that additional evidence is needed or that the Commission erred as a matter of law. If they ultimately deny your extension, then what do you have left? Just to be clear, I represent the Commission. So if the Commission were to ultimately deny an extension, then, depending on the time frame, I think that the permit might become void, because the permit becomes void on a date certain, May 12, 2026. It's about six months out at this point. So what do you want this Court to do? Affirm the Commission, Your Honor. Yes, I understand. Because I guess the Commission's position is that the extension was justified. The Commission reviewed the record, it followed its rules, and that the extension should be affirmed so that the whole thing can start moving forward. Now, Stedge contends that the permit became void, unbeknownst to anyone back in 2023, while the ED was considering the second extension. But that's not what the Rule 116.120 actually says. The Rule just says, if construction hasn't begun by a date certain, then it becomes void, except that the ED can grant extensions of that deadline. It does not say the ED cannot grant an extension after the construction deadline passes. It doesn't say anything about the ED losing authority, nor does it say that the ED must act within a specified timeline. Also, it doesn't give the permittee a deadline by which to request an extension. It's broad. It gives the ED discretion to grant an extension. There's no plain language in that Rule that supports appellant's contention that the ED loses jurisdiction based on the construction deadline. And there's a lot of Texas authority that contravenes their position. First, there's the Commission's guidance on extensions for start of construction, which says that applications should be submitted in hard copy unless there isn't time to do so before the deadline runs, in which case the Commission accepts the facts, followed up with a hard copy, which contemplates that the agency has authority to act after the deadline, because otherwise why follow up with a hard copy? And there's a policy reason for that as well, is that this ensures that the ED isn't rushing to make a determination. They've got time to ask for and receive whatever information she believes is necessary to make a good decision. I'll also mention that under Texas law, an agency's construction of a Rule that it implements is entitled to serious consideration if it's reasonable and does not conflict with the plain language of the statute, of the Rule, sorry. There's also Texas case law regarding permits and extension construction specifically. The Railroad Commission of Texas versus COPOC case involved a very similar statute that provided that a permit terminated if mining activities weren't begun, and also provided for extensions. And there the protestant, just like appellant here, claimed that it had automatically terminated while the agency was considering the application. And the court there looked at basically the same factors that are here, noted that the statute does not impose a deadline on the Commission to decide before the extension, and that there's no specific deadline by which the permittee has to file the application. And it categorically rejected the voidness argument, noting that it would lead to arbitrary and unfair results and render that extension option meaningless. COPOC also addresses appellant's contention that because a different Rule pertaining to permit renewals addresses tolling that the court should imply a lack of tolling here. And it noted that the extension provision contrasts with the much more detailed permit renewal process where a permittee has a deadline. They have to file their application six months prior to the expiration date. And the ED also has a deadline. She has to prepare a report 180 days after the filing of that application. And what the court said is they're not going to rewrite the extension provision to imply that an agency loses jurisdiction to act. And the Supreme Court denied the protestant's petition for review in COPOC. So under Texas law, the permit did not become void back in 2023. That's also consistent with FERC's practice, which is that it requires, as long as a permit, a permittee applies before the deadline runs, FERC retains jurisdiction to grant that extension. Now, I do need to jump sideways for just a second and mention, so the extension does not, does not go beyond 18 months. And it goes from 18 months from the original extension. Extensions run consecutively from those. So the fact that the agency took two months instead of one month to make that decision didn't give the permittee any extra time. It's just, that's how the rule is written, and that's also how the commission has been, what the commission did. It's also consistent with Texas judicial practice set forth in Rule 5. Now, with the court's indulgence, I'd like to move on to substantial evidence supports the commission's action here. First, as I, this is an extension of time, not a decision on the merits of the permit, and that the rule provides for review of BACT and for possible reanalysis of health effects does not entail a substantive reanalysis of the permit. What STEDJ is advocating for would totally obscure the distinction between an extension of time and an entirely new permit proceeding. And to be clear, the rule does provide that if the ED thinks that a substantive reanalysis of the permit is merited, the rule gives the ED authority to do that. She can require the permittee to apply for a revision. And that's what this rule does, is it's a, it sort of enables a quick check to see, does, do we need to completely reevaluate this permit? The rule balances the need for extensions due to litigation or whatever else comes up, but primarily litigation, as happened here, with ensuring that the extension, that everything hasn't changed, that the BACT technology hasn't made a leap, that we don't know something now that we didn't know then. And that's possible because of who the rule charges to make that determination. It's the executive director who did the technical review and all the modeling and reviewed all the modeling of the permit and who proceeded through that contested case and who is also, by virtue of her posture both in handling permits but also in handling enforcement cases, on BACT and on current practices and regulations. And she's charged to review the extension to see if the permit needs to be revised, but not, but, but an extension doesn't always entail a permit revision. And that's really what the protestants are contending. They're, they're arguing that we should have substantively reanalyzed every aspect of this permit. And that's not what an extension rule does. The record here supports that no revisions were necessary. First, we've got BACT, which is best available control technology. And both the permittees' experts and the TCEQ's experts looked at that technology required by the permit and said, yes, it is still the best available for this facility. You've got the engineer's statements in the record at 22. Also the table that they put in at 37 and 38. And then you've got TCEQ's reviewer, which was an independent analysis that also, I mean, and that's what these reviewers do. They're familiar with what is current BACT. And that's a record at 46. I do need to clarify, it may have been just a misstatement on his part, but there are two separate TCE, there's the ED's expert review, which is the, at 46, and then you've got the decision, which is at 47. So there's two different steps and he conflated both of those and I just wanted to clarify that. Now, what Appellant wants to do is invite this Court, and they made the same argument at the Commission, to speculate on whether there might be other technologies available now. That's theory and potential, not BACT. And as this Court recognized in the Pecan case, BACT is proven through experience and research to be operational, obtainable, and capable of reducing emissions. By definition, theoretical what-ifs are not BACT. Also, the expert agency here, the TCEQ, is the one that's charged to decide whether BACT is met. And BACT is, as y'all I'm sure are aware, for a facility like this, there are a lot of different pieces that all have to be BACT. And what the Commission did when it reviewed it is you look at all of them and make sure that one doesn't skew something else. What Appellant wants to do is have you cherry-pick and say, oh, well, wait, we're going to make this one, and it doesn't work that way. And that's part of what the Commission does and why we have an expert agency. Now I'd like to briefly address the issue of the changes in the NAAQS. Just to clarify, is the Commission's argument that, for the third extension, you're not required to do the revision process based on best available control technology and the rest of that? Or that you are required to do it, but it's satisfied? The Commission's, well, and so here we've also got what the Commission, what the ED did. The rule, the rule gives the ED authority to ask for whatever she thinks she needs. In this case, the ED asked for that information. And so that information was all before the Commission. My position is that, the Commission's position is actually two. It's, one, the rule does not require it per se, but that here, the ED asked for it, so, and that's, and so it was before the Commission, and she made that decision in the Commission. There's, so does that make sense? Yeah. What's your argument that it's not required? It's that. In reference to B-2, as opposed to? Yes. It's in the reference, that it's in reference to B-2, and that, as your Honor said, if the rulemaking process, if they had wanted to incorporate all of B and B-1 into that, that they could have done so. What's your best authority for the fact that we construe B-2 to be, a reference to B-2, to be just B-2 and not the higher level of the? The plain language of the rule, your Honor. Okay. Do you have any case law that, in terms of applying interpretive canons that would reach that result? Because it's not crazy to say that a reference to B-2 includes a reference to B. Yeah. No, I didn't bring any with me, your Honor. I can certainly, I'd be happy to offer more afterwards if you'd like me to. Going on to the question of the NAAQS, the ambient air quality standard is a standard for ambient air for an area. It's not, a change in that doesn't change BACT, and it doesn't affect public health directly. Using BACT is how the Commission ensures that an area's air quality meets that standard. In addition to that, there's record evidence that supports there was no need for permit that's in the technical review document, and it predicted that the maximum annual PM 2.5 concentration would be less than half of EPA's significant impact level for the new standard. That's in the record at 90 to 91, and as this court noted in the Sierra Club versus Louisiana DEQ case, significant impact levels, or SILs, are numerical levels below which the EPA considers a source to have an insignificant impact on ambient air quality. That's what was before the Commission was that initial modeling and then the information that EPA had put out that showed that that modeling still showed it was less than half. In addition, we had the fact that there's no proposed or existing nonattainment designations for that area, and that's in the record at 22. Appellant wants to say that, well, you know, appellant believes that the background has been exceeded. That is not something that EPA has put out, and this is something that is within EPA's purview. We've also got the fact that the engineer's statement showing the project had not changed. So in conclusion, Your Honor, there is a rational relationship between the agency's here and the evidence before it. What we were looking at is just an extension of time. The appellant really wants to reopen the entire permit, and that's not what an extension of time does unless the agency tells the permittee they need to reapply. Thank you. Thank you. Thank you. Ms. Petronio. May it please the Court, Beth Petronio on behalf of Intervenor Texas LNG, LLC. I'd like with my limited time just to jump straight to what the plain language of Section 116.120 requires and how we complied in our submission with what was necessary to obtain a third extension. We do contend that Section 116.120C is a standalone provision of that rule standing alone from Section A, which discusses voidness in the absence of extensions, Section B, which discusses the first and second extensions of time, and Section C, which discusses how you obtain a third extension. Section C allows for a third extension with simply two showings, one, that a second extension had been granted on the basis of pending litigation, which was present here, Section B.2 of that rule, and then, second, that you've met the minimum $5 million threshold. And although the $5 million threshold had been an aspect of the challenges below and was involved in the briefing, I think everyone's now conceded that the documents that have been submitted to this Court under SEAL satisfied the $5 million threshold. So the two requirements of Section C have been met, and the extension was properly granted. So I'm going to ask you the same question I've asked others. What's your best authority for the fact that the reference to B.2 excludes a reference to the rest of B? There are a variety of cases for the plain textual reading that are cited on page 30 of our brief that discuss just the statutory reading. There are plenty of cases that say we follow plain text. The question is, what does it mean to follow plain text when there's a reference to B.2, and how best to interpret B.2? If your opposing counsel refers to the Scalia-Garner subparts canon, I don't think it works, but I'm still looking for authority on your side. I disagree that it works as well, Your Honor, because Right. But just because their argument doesn't work doesn't mean you win. It just means I'm still doing the analysis. I think the cases we cited on page 30 are the best authorities we have for the plain construction of the statute, Your Honor. Even so, it's clear here, and the petitioners have cited the court to the fact that here TCEQ did, in fact, require more when we submitted our extension application, and Texas LNG gladly followed the requirements and the requests of TCEQ to give more information about both BACT and the NAAQS. So I want to talk a little bit about both of those very quickly. BACT is something that is industry standard, and in this particular situation, TCEQ has a website on which it posts the BACT for applicable to flares or thermal oxidizers, the various technologies that are involved here, and the facilities then evaluate whether there's new control technology. So any time between 2020, when this permit was originally issued and deemed to be BACT, and the time the extension was requested, have there been new control technologies or have there been changes to the facility? Those are the only two ways that you would have to reevaluate BACT, right? Here, there had been no new control technologies, no changes from TCEQ's approved tier one BACT posted on their website, no changes to our facility. So these are things that are easily evaluated. They're well known in the industry. The experts at TCEQ are well aware of them. The experts at Texas LNG are well aware of them. There had been no changes to BACT for thermal oxidizers, for the heaters, for the flares. None of those things had changed in the intervening five-year period between the permit and the extension request. So to say there have been no changes and there have been no new control technologies is all that needed to be said because that establishes you are still operating currently as BACT. The same is true with the NAAQS in this particular situation. So NAAQS is a that even for a minor source, which we weren't necessarily required to do, we went through a three-tier process of air modeling when the permit was approved. The first is evaluating your, what I have always referred to as the emission right at the spigot where it's going to be at its highest concentration. You look to your highest concentration, then you compare that to your significant impact levels or your NAAQS and you evaluate do we need to do further testing in this particular situation? The answer was yes for particulate matter. So they went to an evaluation where you then begin to analyze the background. What do other facilities and other emitting sources in the area, what's our total there? And if you surpass certain levels at that analysis, then again, you say, okay, we need to move to a third level. Then you move to a third level where you take the background concentrations out and you begin to look at actually how are your emissions as they come out, not just at the spigot, but how are your personal sources contributing to the emissions? Then you compare those levels again to your significant impact levels. Here, when the permit was issued, the significant impact level was a .3. You have to be below a .3 for that third stage. And the facility was at a .06. So well below it, no additional need to just to say that that same level, even when the SIL changed, the recommended SIL went to 1.3, we were still at a .06 from the prior modeling. So there was no need, and TCEQ knew there was no need to do further emissions testing. Thank you. Mr. Bookbinder, you've got five minutes. Thank you, Your Honor. Briefly, the issue of B versus B2, in addition to the Garner reference, we have cases, like we said, on pages 19 to 20 of our brief on this issue. More importantly, we are not seeking to reopen the permit. We're seeking to apply the rules that TCEQ laid down for itself in this regulation. And we cite the regulatory preamble when this regulation was enacted in 2003, talking about how important it is to go back and examine BACT and look at health issues when permits are up for renewal. As a matter of fact, the, when there was a 28-J letter from TCEQ that referred to a 2002 agency guidance, and in that agency guidance, it talked, back then there was only a single extension in 2002, a single 18-month extension with no criteria whatsoever. But the guidance document said, before recommendation for a permit is made, you will need to review the permit to make sure it still meets current BACT and that off-property impacts are still acceptable. They're talking about a change in standards. This is important enough that they read this in a guidance document. They said the regulation doesn't say anything. We're going to include it in a guidance document. And then the following year, they redid the regulation entirely. The idea that TCEQ did its job here and has substantial evidence, TCEQ's conclusions are exactly one sentence. The proposed extension is allowed, quote, per 120B, applicant has demonstrated compliance with current BACT and has not made changes to the previously authorized project, which was demonstrated to be protective of public health. There was nothing in here acknowledging a dramatic change in the human health standard, in the NAAQS, and nothing in there acknowledging the fact that, according to Texas LNG's own modeling, the background concentration at that point was over the 9.0 limit. TCEQ took no notice of any of these circumstances. That's it, Your Honor, unless you have any questions. MR. RUBENSTEIN. Thank you. The case is submitted.